# ATTACHMENT A

# TO BOSWELL

# DECLARATION

# PART 1



# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Washington, D.C. 20240

IN REPLY REFER TO:

NOV 1 3 1997

Dear Tribal Leader:

Enclosed you will find the Department of the Interior's report entitled Recommendations of the Secretary of the Interior for Settlement of Disputed Tribal Trust Fund Accounts. These recommendations constitute the culmination of our multiyear effort, under the Indian Trust Funds Management Reform Act of 1994, to outline measures to resolve disputed Tribal trust fund account balances. A press release is also enclosed.

This proposal builds on the legislative options for settlement that the Department submitted to Congress on December 11, 1996, and that we sent to you at the same time. After submitting the options to Congress, the Department consulted with and provided an opportunity for written comments from Tribal representatives throughout the country about the approaches we were considering. As you will note from our recommendations, we have significantly altered many of our initial suggestions based on your comments.

The following objectives guided the formulation of this proposal:

- acknowledge and respect Tribal sovereignty;

- achieve a settlement that is fair to both the Indian community and the general public;

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff);

- encourage settlement by providing incentives to settle and disincentives to litigate;

- use the most informal settlement processes available rather than litigation to encourage Tribal participation;

- obtain funding for the settlement without reducing appropriations for the BIA and Office of the Special Trustee budgets and Tribal programs; and

- achieve agreement on account balances through September 30, 1992, or the date of settlement, as an agreed-upon starting point for the future.

The legislation which we propose seeks to settle claims relating to the Department's management of Tribal trust funds for the period July 1, 1972 through at least September 30, 1992, and at each Tribe's option, for the period after 1992 through the date of settlement. Unlike the options presented in the Department's December report, we do not recommend a settlement involving a singular, programmatic action such as an Indian Development Bank. Rather, the proposal recommends a two-stage settlement process for resolving accounting claims. First, the government would pay each Tribe for known errors (regardless of whether it accepts any settlement offer) and would offer each Tribe the opportunity to settle other claims immediately for a specific sum based on a formula that takes into account the particular characteristics of the Tribe's accounts. If the Tribe accepts the offer, claims would be settled according to the formula, and the matter would be closed. If the Tribe does not accept the offer, it would be withdrawn and stage one would be concluded.

In stage two, Tribes would have the opportunity to engage in government-to-government non-binding settlement negotiations with the assistance of a mediator. This opportunity for individual Tribal negotiations was not proposed in the December report, but it was recommended by numerous Tribes during the consultation process. As part of the negotiations, there would be an opportunity to obtain additional data or undertake additional analysis to the extent it would be constructive in reaching a satisfactory resolution of claims. In the event that the mediation process is not successful, a Tribe would be authorized to file a claim in the United States Court of Federal Claims within the parameters defined by Congress in the legislation.

The reconciliation project encompassed the reconstruction of $17.7 billion in non-investment transactions, of which $15.3 billion -- about 86 percent -- were reconciled. For the reconciled transactions, approximately $1.87 million in transactions were in error -- an error rate of only .01 percent. The remaining transactions ($2.4 billion) were deemed to be "unreconciled," meaning that the Department could not locate all source documents required under the Project procedures to verify the accuracy of the general ledger entry for the transactions within the time frame allotted to the reconciliation process. While this does not mean that the $2.4 billion is lost or missing, it indicates that the poor condition of the records and systems did not allow the federal government to conduct a complete audit or provide the level of assurance to account holders that was expected. Work on the unreconciled transactions has continued, reducing the total value of those transactions from $2.4 billion to $1.97 billion.

This proposal is one aspect of a larger, three-pronged effort to account and provide compensation for inadequacies of the past, and reform the Department's management of trust funds. Remedying these inadequacies is a major goal of Secretary Babbitt. First, we have embarked on a concerted program to implement key elements of the strategic plan of the Special Trustee for American Indians to improve the underlying trust management and accounting systems. If we receive the necessary funding for our initiative, significantly upgraded systems will be in place nationwide in three years. Second, we have proposed legislation to halt and reverse fractionated ownership of Indian land. We believe this is a

critical element in assuring our ability to manage trust funds properly.

This proposal to settle past claims is the third component. This proposal could affect the interests of all Tribal trust account holders. I encourage you to review this material and participate in the Congressional process through which the proposal will be considered.

Sincerely,

*Hilda A. Manuel*

Deputy Commissioner of Indian Affairs

Enclosures

3



# Recommendations of the Secretary of the Interior for Settlement of Disputed Tribal Trust Fund Accounts



# TABLE OF CONTENTS

| | |
|---|---|
| Executive Summary | 1 |
| 1. Trust Funds: An Overview | 3 |
|     Objectives for Settlement Proposal | 4 |
|     The Nature of Trust Funds | 4 |
| 2. Background On Efforts To Resolve The Problems | 6 |
|     Actions to Reconcile the Accounts | 6 |
|     American Indian Trust Fund Management Reform Act of 1994 | 7 |
|     The Reconciliation Project Results | 8 |
|     Tribes Address the Reconciliation | 9 |
|     The Limitations of the Reconciliation | 9 |
| 3. The Department's December Report On Settlement Options | 10 |
|     Type 1 Claims | 10 |
|     Type 2 Claims | 11 |
|     Type 3 and Other Claims Outside the Scope of the Project | 11 |
|     Tribal Comments on the Options | 11 |
| 4. The Settlement Proposal | 13 |
|     Scope of the Settlement | 13 |
|     Global Settlement | 14 |
|     Overview of the Settlement Proposal | 14 |
|     Additional Reconciliation | 15 |
|     Settlement of Known Errors | 16 |
|     Rate of Interest | 17 |
|     Netting and Forgiveness | 18 |
|     Settlement of Claims for the Period 1972 Through the Date of Settlement | 20 |
|     Stage One: The Settlement Offer | 20 |
|     Stage Two: Government-to-Government Negotiations | 21 |
|     Litigated Resolution of Claims for the Period 1972 to Date of Settlement | 22 |
|     Resource Requirements for the Settlement Process | 24 |
| 5. Conclusion | 26 |



# EXECUTIVE SUMMARY

The Administration is pursuing a three-pronged strategy to address issues related to the Department of the Interior's administration and management of Indian trust funds. First, in this report we are proposing a legislative approach that utilizes informal dispute resolution mechanisms to address claims that Tribes may have with regard to the Department's past management of Tribal trust fund accounts. Second, in conjunction with the Special Trustee for American Indians, we have developed recommendations for improving the underlying trust management and accounting systems, and are in the process of implementing those improvements. Third, we have proposed legislation to end the increasing fractionation of ownership of Indian allotted lands. This fractionation of interests not only undermines the economic vitality of allottee-owned land, but it also severely complicates the government's management of trust assets and resources.

The recommendations encompassed in this report are the culmination of a five-year, $21-million effort to reconcile Tribal trust accounts as mandated by Congressional directives beginning in 1987, and reconfirmed in the American Indian Trust Fund Management Reform Act of 1994 ("the Act"). As of August 1, 1997, the Secretary of the Interior, through the Office of the Special Trustee (OST), maintains approximately 1,500 accounts for 338 Tribal entities with assets in excess of $2.5 billion. Each year, more than $802 million passes through the Tribal trust funds system. Although not the focus of this report, the OST also maintains over 300,000 individual Indian money (IIM) trust fund accounts through which over $300 million pass each year.

The Tribal Reconciliation Project (the "Project") was undertaken by Arthur Andersen, LLP, ("Arthur Andersen") under the supervision of the Department. The basic reconciliation procedures of the Project encompassed the reconstruction of $17.7 billion in non-investment transactions, of which $15.3 billion — about 86 percent — were reconciled. For the reconciled transactions, approximately $1.87 million in transactions were in error — an error rate of .01 percent. The remaining 14 percent of transactions ($2.4 billion) were deemed to be "unreconciled," meaning that the Department could not locate all source documents required under the Project procedures to verify the accuracy of the general ledger entry for the transactions within the time frame allotted to the reconciliation process. (As described below, reconciliation work has continued resulting in the reconciliation of almost $.5 billion of previously unreconciled transactions). While this does not mean that the $1.97 billion is lost or missing, it indicates that the poor condition of the records and systems did not allow the federal government to conduct a complete audit or provide the level of assurance to account holders that was expected. The results of the Project are described in more detail in this and the earlier reports described below.

Upon completion of the Project, the Act directed the Secretary of the Interior to prepare a report to Congress by May 31, 1996, outlining the Project results and the efforts the Secretary will undertake to resolve disputes regarding Tribal trust account balances. Because Tribes required additional time to review their Project reports, an interim report was submitted to Congress on May 31, 1996, with a supplemental report filed on December 11, 1996 (the "December Report"). The December report also described a series of legislative options for resolving disputes regarding Tribal account balances. The Department engaged in a consultation process with Tribes on those options, including four public meetings and the opportunity to file written comments. The legislative recommendations for resolving disputed account balances contained in this report are based in part on the options in the December report and the comments of Tribal representatives in the consultation process.

The legislation which we propose seeks to settle claims relating to the Department's management of Tribal trust funds for at least the period July 1, 1972 through September 30, 1992, and at the Tribes' option, for the period after 1992 through the date of settlement. Unlike the options presented in the Department's December report and the recommendations of the Special Trustee, we do not recommend a settlement involving a singular, programmatic action such as an Indian Development Bank. Rather, there would be a Tribe-by-Tribe, government-to-government settlement process which would take into account the specific circumstances and claims of each Tribe.

The OST, in conjunction with the accounting firm of Chavarria, Dunne & Lamey, LLC, has continued its efforts to locate documents and reconcile some of the previously unreconciled disbursement transactions utilizing the same procedures used by Arthur Andersen in the Project. Once this process has been completed, the Tribes will be provided with a report describing the impact of the additional work. Under the settlement we propose, the government would identify all errors identified by both the Project and the additional subsequent work ("known errors"), and would pay the Tribes where money was found to be owed, with compound interest, as soon as possible. Because the government, as trustee, is obligated to correct its errors, these payments would be made notwithstanding a Tribe's willingness to settle its other claims.

The proposal then recommends a two-stage settlement process for resolving accounting claims other than those relating to known errors. First, the government would offer each Tribe the opportunity to settle claims immediately for a specific sum based on a formula that would take into account the particular characteristics of the Tribe's accounts. If the Tribe accepts the offer, claims would be settled by payment according to the formula, and the matter would be closed. If the Tribe does not accept the offer, it would be withdrawn and stage one would be concluded.

In stage two, Tribes would have the opportunity to engage in government-to-government non-binding settlement negotiations with a mediator. This opportunity for individual Tribal negotiations was not proposed in the December report, but it was recommended by numerous Tribes during the consultation process. As part of the negotiations, there would be an opportunity to obtain additional data or undertake additional analysis to the extent it would be constructive in reaching a satisfactory resolution of claims. If the mediation process is not successful, a Tribe would be authorized to file a claim in the United States Court of Federal Claims within the parameters defined by Congress in the legislation.

This report provides a brief historical overview of Indian trust funds (Part 1), some background on efforts to address the problems relating to trust fund management and accounting, including the Reconciliation Project (Part 2), a description of the Department's December report, including the options for settlement of Tribal claims and Tribal response (Part 3), and in Part 4, a detailed discussion of the Department's settlement proposal.



# 1. TRUST FUNDS: AN OVERVIEW

For nearly 70 years, Congress and the Executive Branch have made repeated efforts to improve the Bureau of Indian Affairs' accounting systems and procedures. These efforts, however, have never received the resource commitment necessary to keep pace with the task. Meanwhile, the problems and the costs of addressing them have continued to increase.

For the first time in the last six decades, real progress is being made. Secretary Babbitt has made proper accounting and management of Indian trust funds a major priority for the Department. We are proposing to work closely with Congress to compensate any Tribal trust fund account holders that have been harmed by past accounting and financial/trust fund management practices and to fix the systems and practices that led to problems in the first place. With a major reconciliation of the Tribal trust funds completed — at great cost to the United States — and with plans under development to repair and upgrade the basic accounting systems, the Secretary believes that we have a historic opportunity finally to resolve this issue.

This report and proposal is one component of a three-part effort to address this very complex matter. It is the culmination of many years of intensive work and it proposes what we believe is a comprehensive, logical and fair process for compensating Tribes for any losses they may have suffered from July 1, 1972 through September 30, 1992, as a result of the trust fund management and accounting systems in place. At the Tribes' option, settlement could also be reached for the period after 1992 through the date of settlement. We believe that addressing problems of the past is a fundamental component of facing the future.

A second and separate initiative involves building on some of the work of the Special Trustee to overhaul the trust management systems. Earlier this year, the Special Trustee submitted his recommendations to Congress on improving the trust management and accounting systems. The Department reviewed the specific details of the Special Trustee's five-year, $167 million proposal and requested that the Special Trustee further develop the costs and benefits of his system proposals, along with alternatives for achieving the necessary system improvements. As a result, the Secretary and the Special Trustee have developed a more limited approach that focuses specifically on data cleanup, elimination of trust asset processing backlogs and revamping the trust management and accounting systems over the next three years. The Administration will continue to seek funds in its annual budgets to carry out these efforts.

The third component of this effort involves the problem of fractionated ownership of Indian lands. Past Federal law and policy left a legacy of thousands of individual parcels of land in Indian Country with scores or even hundreds of owners. This impedes the ability of the Department and the landowners to maintain the economic viability of the land, and adds massive complexity and expense to the trust management and accounting responsibilities of the federal government. On June 18, 1997, the Administration submitted a legislative proposal to address this issue. If we hope to resolve the problems affecting the federal government's ability to discharge its trust fund responsibilities effectively, all three components of this plan must be implemented.

Resolving claims of the past — the subject of this report — is extremely difficult and there is not one right way to do it. If these were simple and straightforward matters, they would have been resolved long ago. We are proposing what we believe to be a fair, judicious and efficient process for resolving Tribal trust fund claims, taking into account the fact that there is much supporting documentation that has not been found.

Our overriding objective is to achieve fairness and justice with respect to disputes over Tribal trust

account balances. We are committed to doing the best job we can, recognizing the limitations of the current systems and the availability of records, to settle valid Tribal claims. The effort must be principled and undertaken in good faith, paying those to whom money is owed, with due regard to fiduciary obligations, while, at the same time, not providing a windfall where little or no reasonable likelihood of loss exists. Our proposal is consistent with these principles.

## Objectives for Settlement Proposal

The following objectives guided the formulation of this proposal for a legislated settlement of Tribal trust fund claims:

- acknowledge and respect tribal sovereignty;

- achieve a settlement that is fair to both the Indian community and the general public;

- achieve the most resource-efficient settlement of claims (in terms of conserving federal government and Tribal time, money, and staff, including attorneys' and expert witness fees);

- encourage settlement by providing incentives to settle and disincentives to litigation;

- use the most informal settlement processes available rather than litigation to encourage Tribal participation;

- obtain funding for the settlement without reducing appropriations for the OST and BIA budgets and Tribal programs; and

- achieve agreement on account balances through September 30, 1992, or the date of settlement, as an agreed-upon starting point for the future.

This report is a follow-up to an earlier report, submitted to Congress in December that outlined proposed options for settlement of disputes related to Tribal trust funds. Since submission of that report, we have engaged in consultation with the Indian community on the proposals contained in the report, and Tribal leaders have offered invaluable advice and suggestions on ways to improve the options.

## The Nature of Trust Funds

There are two broad categories of trust fund accounts held by the government for Indians. One type comprises some 300,000 Individual Indian Money (IIM) accounts, each held for a single individual, or in some cases a Tribe, or as a holding account for certain "special deposits." The IIM accounts are currently the subject of a class action lawsuit brought by IIM account holders against the United States, Cobell v. Babbitt, 1:96CV01285 RCL (D.D.C.), and are not covered by the proposal in this report. The parties are working diligently to define a process by which those individual claims pertaining to IIM accounts will be examined and adjudicated.

The other type of accounts — which are the subject of this report — comprise some 1,500 Tribal trust fund accounts held for 338 Tribal account holders, rather than for individuals. The Tribal trust fund accounts contained assets in excess of $2.5 billion, as of August 1, 1997. Each year, more than $800 million in non-investment receipts, transfers and disbursements pass through these Tribal trust accounts. There are several types of Tribal trust accounts, although most fall under the following three categories:

- funds derived from trust resources such as timber, grazing, oil & gas (often designated Indian Money Proceeds of Labor);

- funds derived from awards of the Indian Claims Commission or other judgment awards (judgment funds);

- funds derived from various legislation, including land and water claims settlements (settlement funds, also often called judgment funds).

This proposal sets out a process for resolving claims arising from the Department's management of the Tribal trust fund accounts, from July 1972 through at least September 1992, and at the Tribes' option, for the period October 1992 through the date of settlement.



## 2. BACKGROUND ON EFFORTS TO RESOLVE THE PROBLEMS

Concern about the management of Tribal trust funds has been longstanding. Indeed, the General Accounting Office (GAO) — the investigative research arm of Congress — issued reports as early as 1928 documenting weak accounting practices and other problems in BIA's trust fund management. Prior to 1951, accounting activities were undertaken at each BIA Agency Office (typically located on Indian reservations), using handwritten ledgers and journals. In 1951, an accounting system designed and approved by GAO was installed in BIA Area (regional) Offices. All fund types — IIM as well as Tribal — were integrated in this system. GAO released reports in 1952 and 1955 describing management and systems concerns.

Beginning in 1965, BIA began centralizing its accounting functions on a mainframe computer in Albuquerque, New Mexico. The conversion to the computer system was complete in 1967, although a duplicate manual set of Tribal fund "control accounts" were maintained in Albuquerque until 1987. A new automated accounting system was developed and implemented in 1968 and modified in 1974. In 1982, GAO once again issued reports critical of the management systems. The Environment, Energy and Natural Resources Subcommittee of the House Committee on Government Operations encouraged a three-year investigation into the issue, leading to a report issued on April 22, 1992, entitled *"Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund."* The Special Trustee attributes many of today's problems to the failure to upgrade the systems adequately over the past twenty to thirty years.

Congressional appropriators were concerned as well. In 1987, after a series of oversight reports by the GAO, a supplemental appropriations bill directed that trust fund accounts be reconciled and audited. Congress also prevented the outsourcing of trust fund services to a commercial bank until the funds had been audited and reconciled. In 1988, 1989 and 1990, Congress again directed the BIA to take steps to reconcile Indian trust fund accounts back to the earliest possible date. The FY 1990 appropriations language further required that "the results of such reconciliation [be] certified by an independent party as the most complete reconciliation of such funds as possible."

### Actions to Reconcile the Accounts

The BIA began its reconciliation of Tribal trust accounts in 1990. The BIA, the GAO, and the Department's Inspector General worked in conjunction with an ad hoc Tribal advisory group, later named the Intertribal Monitoring Association (ITMA), to develop a "request for proposal" for a reconciliation contract. In May 1991, the reconciliation project contract was awarded to a national accounting firm, Arthur Andersen LLP.

The initial work, called Phase I, sought to determine what records were available, what procedures would be necessary, and what the cost would be of a complete reconciliation for both Tribal and IIM accounts. It found that not all supporting documents could be located, but those that were found could be examined, and that some BIA trust policies, procedures, and systems had deficiencies. As a result, it was agreed through discussions involving the Department, the Office of Management and Budget (OMB), Congress, and ITMA, that a conventional financial audit was not likely to produce meaningful results.

In view of this, the Department, in consultation with OMB and ITMA, began to look at alternative methodologies and approaches. The goal was to produce as accurate an accounting as practicable. Ultimately, methodological procedures were agreed upon by the Department, OMB and Tribal representatives, and were incorporated into the contract with Arthur Andersen. The procedures do not constitute an audit in accordance with

generally accepted auditing standards; however, they were deemed to be the best available approach, given the constraints of the incomplete documentation. These procedures were used by Arthur Andersen to reconcile the Tribal trust fund accounts for the period July 1, 1972 through September 30, 1992.

Appropriation language directed that funds be "audited and reconciled to the earliest possible date." The reconciliation project went back as far as July 1, 1972, in order to focus on the time period that was deemed to likely be the most susceptible to problems or errors. July 1, 1972, is a critical date for several reasons.

On July 1, 1972, all Tribal Treasury appropriation accounts were consolidated into a single Treasury account (approximately 1,000 accounts were combined). Prior to this date, Treasury maintained separate accounts for each Tribal trust fund, typically with separate accounts for principal and interest. These dual sets of accounts would generally make it easier to detect differences; for example, if Treasury received a cash receipt that was not posted by BIA it would be easy to isolate the difference — a variance would show up between the specific account on BIA's books and the specific account on Treasury's books. Such differences were not as easy to identify when the accounts were collapsed into one account. Rather, the sum of approximately 1,000 accounts on BIA books would need to be compared to the one balance on Treasury's books, and if the totals were different, it could be necessary to review the activity in all 1,000 accounts to determine which individual account caused the variance. Nevertheless, consolidation occurred to alleviate the administrative burden of Treasury maintaining a dual system of Tribal trust accounts.

Additionally, in the year following July 1, 1972, Treasury discontinued calculating and posting semi-annual interest income to trust fund accounts. From 1928 to 1972, Treasury had computed and distributed interest on a semi-annual basis for funds residing in Treasury accounts. BIA Offices deposited and posted interest earned from investment activity outside of Treasury. Beginning July 1, 1972, BIA was responsible for computing and distributing the Treasury interest on uninvested funds. For these reasons, July 1, 1972, was considered to be a logical starting point for the reconciliation.

## American Indian Trust Fund Management Reform Act of 1994

In 1994, while the Arthur Andersen reconciliation efforts were ongoing, Congress passed the American Indian Trust Fund Management Reform Act of 1994, 25 U.S.C. §§ 4001-4061, which established the Office of the Special Trustee for American Indians. Under this legislation, the Special Trustee is responsible for oversight, reform, and coordination of the policies, procedures, systems and practices used by various Departmental agencies in managing Indian trust assets. The statute requires that the Secretary transmit to Congress a report that describes the methodology and results of the trust fund reconciliation, includes Tribal attestations as to disputed account balances, and outlines efforts the Secretary will undertake to resolve such disputes. An initial report was submitted to Congress on May 31, 1996, and another on December 11, 1996,[1] with a commitment to provide this final report on the Secretary's

---

[1] Because most Tribes did not have sufficient time to review their reconciliation reports and submit attestations as to their account balances by the May 31 deadline, the Secretary submitted an interim report describing the reconciliation procedures on May 31, and set a deadline of September 27, 1996, for submission of attestation responses. With the extension of the deadline for submitting attestation responses, the Secretary promised to submit a supplemental report to Congress, including proposed legislative options to address disputed account balances, later in the year. The options were discussed in the December 11, 1996, report.

7

0820

specific recommendations for resolving disputed Tribal account balances.

In accord with the Congressional mandate to have an independent certification of the Tribal trust fund reconciliation results, BIA awarded the certification contract to Coopers and Lybrand LLP in September 1993. However, due to a projected cost that far exceeded available resources, the Special Trustee, after consultation with GAO, OMB and Departmental officials, terminated the contract in October 1995, before the certification was completed. At the Special Trustee's request, Coopers and Lybrand provided a close-out letter summarizing the work performed prior to termination. The letter stated that no conclusions could be drawn from the preliminary information reported because the certification work was not completed. Later, Arthur Andersen investigated and cleared all Coopers and Lybrand's comments on the preliminary reports.

## The Reconciliation Project Results

In January 1996, the Department released Project reports, along with electronic copies of supporting Project workpapers to Tribal trust fund account holders summarizing the results of the Project. The report also requested that Tribes submit attestations as to whether they accepted or disputed their account balances. The agreed-upon procedures used in the reconciliation were intended to accomplish the following:

- verify that non-investment financial transactions posted to the BIA's official accounting records are in agreement with available supporting financial source documents (the "basic reconciliation");

- assess the accuracy of investment income posted to Tribal accounts;

- recalculate the U.S. Treasury interest earnings;

- reconcile BIA general ledger balances with U.S. Treasury balances;

- verify that financial transactions posted to BIA accounting records are in agreement with the originating lease or sale agreements, permits, or contract terms (not completed for all transactions); and

- determine the timeliness of the deposit of receipts.[2]

As of December 1995, Arthur Andersen had examined $17.7 billion in non-investment transactions (251,432 transactions) for the 20-year period from 1972 to 1992 in the basic reconciliation. Of that amount, 86 percent of the transactions (totaling $15.3 billion) were reconciled; that is, financial records were located to support the accuracy of the transactions as reflected on BIA's general ledger. Of the $15.3 billion in reconciled transactions, an error rate of about .01 percent was reported. Errors included both overstatements and understatements of Tribal account balances by the government, as well as payments made to the wrong account or Tribe. The 14 percent of transactions (32,901 transactions) that were not reconciled totaled $2.4 billion, and included the following categories of transactions:[3]

$1.1 billion in receipts (payments to accounts);

$808 million in disbursements (drawdowns from Tribal accounts);

$479 million in transfers between accounts of the same Tribe.

---

[2] The agreed-upon procedures are described in detail in the Special Trustee's May 1996 report to Congress.

[3] All values for unreconciled transactions are, rounded to the nearest million, and expressed in terms of absolute dollars, which means that the positive and negative values of the transactions are disregarded.

As described more fully below, OST has continued its efforts to reconcile the outstanding $2.4 billion of non-investment transactions. As a result of those efforts, the unreconciled transaction have been reduced from $2.4 billion to $1.97 billion.

## Tribes Address the Reconciliation

The Project reconciliation procedures and the proposed adjustments to account balances are detailed in the Project report and were explained to the Tribal account holders at a national meeting on February 14 and 15, 1996, in Albuquerque, New Mexico. More detailed individual consultation with OST was provided to Tribal account holders at a series of regional meetings held through July 1996. Upon the conclusion of the meetings, in August 1996, the Special Trustee sent a second request for the Tribes to submit attestations as to acceptance or dispute of their account balances on or before September 27, 1996.

As of May 1997, the OST had received attestation responses from 92 Tribal trust fund account holders. 41 Tribal account holders accepted the account balances as reflected in the reconciliation reports, and 51 account holders disputed the balance. 47 account holders requested additional time for their response. 171 account holders filed no attestation response. Among the reasons given by those account holders that disputed their account balances were inadequate reconciliation procedures, that they needed additional time, and that the records were inadequate. Other more specific comments were also made that do not fall into one of these frequently stated categories.

## The Limitations of the Reconciliation

As noted, despite five years of effort and the expenditure of $21 million, the Project provides a less than complete accounting of the state of the Tribal trust funds. The inadequacy of the trust management systems, policies, procedures and practices, the condition and availability of the trust records, and funding constraints all contributed to the limitations of the Project.

The Project did identify some specific errors (known errors) which resulted in both understatements and overstatements of Tribal trust fund account balances. Those errors should be corrected. The most difficult issues, however, relate to the unreconciled transactions where all required records could not be located to support $1.97 billion of non-investment transactions for the 20-year period of the Project, and to those transactions outside the scope and time period covered by the Project.

Of the $1.97 billion in unreconciled transactions, about $1.1 billion are transactions involving receipt of funds by the government on behalf of a Tribal account from third parties, $363 million are disbursements and $479 million involve transfers among different accounts of the same Tribe.[4]

---

[4] It is highly unlikely that the $479 million in transfers and approximately $117 million of the unreconciled disbursements actually resulted in any losses to Tribes. Of the disbursements, some $60 million are positive disbursements (i.e., receipts), where even had there been an error, it would have benefitted the Tribe. An additional $22 million was for attorney and expert witness fees and $35.8 million were disbursements of settlement funds to Alaska Native corporations, and it is reasonable to presume that these entities would have filed claims had the payments not been made. Likewise, where transfers among a Tribe's accounts were posted to the general ledger, it is likely that the Tribe had use of the funds, even if they were posted to the wrong account of the Tribe. Nevertheless, because the supporting documentation could not be located for the transactions to be reconciled, for purposes of settlement they will be treated as other unreconciled transactions and compensated through the process described later in this report.